IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 15, 2023 Session

## IN RE JUSTIN N. ET AL.

**Appeal from the Circuit Court for Polk County**
**No. 21-CV-76      J. Michael Sharp, Judge**
_____

**No. E2022-01603-COA-R3-PT**
_____

Father appeals the trial court's termination of his parental rights to two minor children. The trial court found as grounds for termination: (1) abandonment by failure to support, (2) abandonment by failure to visit, and (3) a failure to manifest an ability and willingness to parent. The trial court also found that termination was in the children's best interests. We affirm as to the finding of abandonment by failure to support and failure to visit. Because the trial court's order does not contain sufficient findings of fact, we vacate the trial court's findings that the father failed to manifest a willingness and ability to parent. We also reverse the trial court's use of the outdated best interest factors and vacate the trial court's finding that termination was in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J. and THOMAS R. FRIERSON, II, J., joined.

Laura M. Crawford, Ducktown, Tennessee, for the appellant, Damien N.

Philip M. Jacobs, Cleveland, Tennessee, for the appellee, David N. and Lisa N.

### OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal stems from the termination of the parental rights of Respondent/Appellant Damien N. ("Father") to two children: Justin, born in March 2010,

and Darrien, born in July 2013.[1][2] The children's paternal grandfather, David N. ("Grandfather"), and paternal step-grandmother Lisa N. ("Grandmother") (collectively, "Petitioners") received physical custody of the children in September 2020 pursuant to dependency and neglect proceedings brought by the Tennessee Department of Children's Services ("DCS") in the Polk County Juvenile Court ("the juvenile court"). Petitioners were directed to supervise all contact between Father and the children. Father was ordered to complete mental health and alcohol and drug assessments; submit to random drug screens and provide a clean hair follicle within three months of a petition for the return of custody; attend individual, family, and domestic violence counseling; complete anger management and parenting classes; and obtain and maintain stable housing and employment. Upon completion of these requirements, the juvenile court would then entertain a petition for a return of custody or unsupervised visitation with the children. The children have remained in the physical custody of Petitioners for the duration of this matter.

In March 2021, Father filed a pro-se petition requesting that custody of the children be restored to him. Father did not appear for the hearing set for August 10, 2021. By order of September 2, 2021, the juvenile court dismissed Father's petition without prejudice. The parties have stipulated that Father then filed a second petition for restoration of his custody of the children.

Petitioners filed a petition for termination of parental rights and adoption in the Polk County Circuit Court ("the trial court") on September 20, 2021.[3] As to Father, Petitioners alleged the grounds of persistence of conditions, abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody of the children.[4] Petitioners also alleged that terminating Father's parental rights was in the best interests of the children. Father filed a handwritten objection to the petition on October 12, 2021. Father was then appointed counsel on November 15, 2021. Petitioners filed a motion for default judgment on June 16, 2022, and on June 27, 2022,

---

[1] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

[2] The parental rights of the children's mother, Robin P. ("Mother") (collectively with Father, "the parents"), were also terminated. Mother, however, did not participate in the termination proceedings or file an appellate brief. Accordingly, she is not a party to this appeal and we discuss Mother's involvement only as necessary.

[3] Father's petition remained pending at the time the termination petition was filed in the trial court, which stayed the proceedings in the juvenile court.

[4] In their petition, Petitioners assert that a ground for terminating Father's rights is that he is "not in a position to assume custody." However, Petitioners cite to Tennessee Code Annotated section 36-1-113(g)(14), which applies when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren], and placing the child[ren] in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren][.]

Father filed his answer opposing termination. Father denied all grounds and that termination was in the best interests of the children; Father also raised the affirmative defense that any failure to visit or support the children was not willful.

The termination hearing was held on July 11, 2022. Petitioners testified first. Petitioners both testified that Father had visited with the children in person only infrequently. Grandfather testified that a visit was scheduled every time that Father requested one. He stated that Father had visited the children approximately four times between September 2020 and September 2021, with two or three visits occurring in the four-month period prior to the filing of the termination petition; Father then visited another approximately five or six times before the termination hearing. Grandmother testified that Father had visited approximately five times total in person: at least once between when Petitioners received custody and spring 2021, once during the four-month period before Petitioners filed the termination petition, and twice after the petition was filed. Grandmother stated that Father had not visited since March 2022. The visits lasted between two and four hours and were supervised primarily by Grandfather. For several visits Father was dropped off by his girlfriend because his driver's license was suspended. Father cancelled a couple visits because of the cost of the three-hour drive to Clarksville from his home. Petitioners admitted that no offer had been made to facilitate visitation at a location more convenient for Father, with Grandfather stating "I'm not the reason that we have the kids."

According to Petitioners, Father would also call or video chat with the children once every couple weeks. Petitioners monitored these conversations as well and would have to end the call when Father discussed the custody proceedings and the children became upset. The children become upset or withdrawn after about half of their visits or conversations with Father; as Grandmother explained it, the children "tend to retract" after visits or calls with Father. Grandmother testified that Father would get "very heated, very angry" during some of the phone calls and that she did not think the anger management course he took pursuant to the juvenile court order was helpful.

Petitioners also testified that Father had not provided any financial support for the children other than a single gift for the older child's birthday four months prior to the hearing. Grandfather explained that shortly before the children were removed from the parents' custody, Father had called Petitioners asking for help getting food for the children. Petitioners sent Father money, ordered groceries, and had the electricity turned back on at the parents' home. Grandmother testified that the children had been removed from the parents' home a few times prior to the instant removal, based on concerns regarding there being no running water or groceries in the home. Petitioners agreed that although Father had promised to pay them back, he had not.

Grandfather testified that the children began meeting individually with a counselor as soon as they came to live with Petitioners. He explained that the children seemed scared

-3-

when first moving in with Petitioners and it took a while for them to "open up" and feel comfortable. Although Father was required to participate in family counseling as part of his responsibilities under the juvenile court order, Grandmother testified that the children are "not there yet" and Father had not been involved in the children's treatment. The children still struggle somewhat with bedwetting, sleepwalking, and night terrors, which behavior Grandmother explained worsens after visiting with Father. As to whether the children's attitudes have improved, Grandfather testified that "[t]he less contact that they have [with Father] the better moods they're in." Petitioners testified that the children's well-being has improved since being placed with Petitioners; they are healthy, more playful, and doing well in school and their extracurricular activities.

Petitioners had never met the children prior to receiving custody. Petitioners both testified that initially the plan was to keep custody of the children until the parents got back on their feet, but they "are in it for the long haul" and now want permanent custody based on how well the children are doing in Petitioners' home and the instability still present in Father's life. Grandfather explained that he knows Father loves the children very much but he does not think Father has the ability to provide for the children. Petitioners have a son ("Junior") who was eight years old at the time of the termination hearing and the three boys have a close relationship. Grandfather testified that Petitioners love the three boys equally and do not treat the children any differently than they do Junior; Grandmother explained that the children had taken Petitioners into their hearts as much as the Petitioners had taken in the children.

The children's therapist, Jeff Lindsey, testified next. No objection was raised to his qualification as an "expert in marriage and family counseling." Mr. Lindsey testified that both children had been diagnosed with post-traumatic stress disorder ("PTSD") after displaying "pretty classic signs" of the disorder, including night terrors, nightmares, sleepwalking, and age regression including bedwetting. He explained that the children were both "really struggling" when they were first placed in Petitioners' custody, especially after speaking with the parents, but now the older child is able to speak with Father without suffering any such symptoms and the younger child is "doing better," with his symptoms not happening as severely or as often as before. However, Mr. Lindsey stated that he was unable to discern the specifics of the circumstances that led to the children's PTSD based on his reluctance to force the children to talk about things before they are ready.

Mr. Lindsey testified that both children had expressed that they missed the parents and their stepsiblings but liked living with Petitioners and did not want to go back to the way things were previously. When asked whether the children's symptoms could be the result of anxiety from being separated from the parents, Mr. Lindsey did not know, but he testified later that "[g]iven everything that we know about the boys[,] it would be highly unlikely" that their symptoms were caused by anything other than PTSD. He explained that he was also working with Petitioners on how to parent the children in a "trauma-informed way" to help the children manage their symptoms; he had not met with either of the parents.

Mr. Lindsey admitted that he had not received a copy of the juvenile court order granting Petitioners custody of the children and directing Father to participate in family counseling, but he had made Petitioners aware that the parents were welcome to contact him. Mr. Lindsey testified that it was in the children's best interests to remain in the care of Petitioners permanently.

Father testified next, explaining the circumstances that led to the children being removed from the parents' home. Father testified that drug dependency had not been a problem he faced personally, but that he knew Mother was using methamphetamine and had often used pain pills off-and-on. Mother would routinely "disappear" for days at a time before returning, explaining that she had been using drugs or with other men. Shortly before the children were removed, Mother had left the family home for two or three days, leaving Father with the children and two of their stepsiblings. Father testified that he asked the children's maternal grandmother to watch the children while he took a walk because he "was tired of . . . this shit and [he] would wish this shit would be over with." The maternal grandmother then called the police to conduct a wellness check on Father, apparently for fear that Father would hurt himself. Father explained that he had never said anything about harming himself to warrant such concern, and that the children had previously witnessed Mother's attempted suicide, so that was not something he would put the children through again. When the police arrived, Father voluntarily agreed to a mental health evaluation. Father stated that he was initially evaluated at a local hospital but the maternal grandmother did not want him to return home based on what she thought she heard him say. Father remained hospitalized for approximately three days while waiting for a hospital in Chattanooga to have an opening, but then he was released ten or fifteen minutes after completing an evaluation at that facility.

Mother returned to the home as Father was being taken to the local hospital. Father stated that DCS became involved in this case because a police officer overheard the older child tell Father that Mother said she needed to go to rehab. Father testified that he was in contact with DCS the entire time he was in the hospital, in order to be able to communicate with the children and Father's stepchildren, who had all been placed with a classmate's family for the duration of his stay. He explained that this family had taken in the children for some time at the beginning of 2020, the first time they had been removed from the home.[5] Father stated that it was his suggestion for DCS to contact Petitioners to potentially take in the children.

---

[5] Father later explained that the children had been removed in early 2020 because a Bradley County juvenile court officer, visiting the parents' apartment regarding Father's stepson, smelled marijuana coming from the general vicinity of the apartment and involved DCS. The maternal grandmother lived across the hall from the parents' apartment and both she and Mother tested positive for methamphetamine use. According to Father, the children and the two stepsiblings were removed from the home for three days before being returned to Father's custody.

Father testified that at the time the children were removed, he was self-employed and making roughly $20,000.00 to $30,000.00 a year doing construction work on contracts with other businesses. Father also earned $20.00 an hour on a bridge-construction crew from June 2021 through June 2022. At no point during the custodial period was Father not employed in some capacity. As to whether he had paid any child support during that time, Father explained that he had not, and that he "was told [he] did not need to. [Petitioners] said they were financially stable enough to take care of it." Even after he told Petitioners that he would pay them, Father testified that on multiple occasions Petitioners "said do not pay them, keep it and save it for when [he] got [the children] home." Moreover, Father stated that he brought the children gifts when he visited for Christmas in 2020, and although he could not visit for Christmas 2021, he brought Christmas presents for the children and a birthday present for the older child when he visited for the child's birthday. Father later admitted that his offers involved offering to bring money with him on his next visit, and that he did not ever hand or wire Petitioners money or send them checks. Grandfather disputed Father's testimony that he had offered Petitioners any financial support.

Father admitted that the March 2022 visit for the birthday was his last visit with the children. He testified that he had visited with the children at least eleven or twelve times since September 2020 when the children were placed with Petitioners: six visits between September 2020 and December 2020, one in January 2021, a couple in July 2021, one in November 2021, and then once in March 2022. Father explained that he had asked Petitioners to bring the children to see him or meet halfway for visits and that several of his requests for additional visitation had been denied by Petitioners.[6] As to phone calls, Father stated that he would be able to speak with the children for only a short period of time before Petitioners would take over the call to argue with him. Father provided records of his phone calls through Facebook Messenger with the children, showing that he had fifty-five calls with the children between September 2020 and February 2022, for a total of almost twenty-two hours. Initially, the calls were frequent—sometimes every day— through January 2021. After that, months would often pass between calls, which Father explained was the result of arguments with Grandfather unrelated to the children or Petitioners ending the calls because they believed he was discussing things he should not. Father also stated that some calls were made directly through his cellphone, though he did not produce those records.

Prior to their removal, Father and the children had "a good, amazing relationship." But the relationship has changed, Father explained, with the children seeming more distant after not seeing or hearing from him as much. Father testified that the children did not have night terrors while living with the parents, but they did suffer from "bad dreams" and the younger child would sleep walk off and on. He also explained that at the time of removal, the children were seeing counselors through their school to address Mother's

---

[6] Grandfather later explained that Father would often only provide notice of his intent to visit the day prior so Petitioners would sometimes be unavailable.

disappearances, suicide attempt, and general instability. Father admitted that he is still married to Mother. He stated that he had filled out divorce paperwork that Mother claimed to have lost, but that he had not been able to return to court to file proceedings without Mother's agreement. Father explained that he lives with his girlfriend in a two-bedroom apartment in Knoxville. The girlfriend has partial custody of her three children, who come to stay with them on weekends. Father also maintains custody of his two stepchildren.[7]

Father provided documentation to show that (1) he had completed individual mental health counseling and was deemed "emotionally and psychologically stable" as of January 2021; (2) he had provided a clean hair follicle for testing in March 2021; and (3) he completed an alcohol and drug assessment in December 2020 and "[did] not meet criteria for any substance use disorder treatment or any other treatment[.]" He explained that he received counseling for domestic violence during his individual therapy, and had completed online anger management and parenting courses. Thus, he had completed many of the juvenile court's requirements prior to filing his March 2021 petition to regain custody of the children. Father testified that he missed the hearing on his petition because he believed it was one day later, and when he showed up to the courthouse the next day and realized his mistake, he immediately filed another petition.

At the end of the parties' proof, the trial court requested counsel provide proposed findings of fact and conclusions of law. Petitioners submitted their proposed findings and conclusions on August 9, 2022. The trial court terminated Father's parental rights by order of October 19, 2022. The trial court found that "there has never been a time that [Father] has ever paid any support of any kind for the children to [Petitioners] or to anyone else" and that Father "had the ability to pay support but he willfully chose not to do so." The trial court also found that Father had visited with the children only one or two times during the four months prior to the filing of the termination petition and that his "visits with his children have been minimal at best." Moreover, the trial court found the testimony of the Petitioners that Father visited the children six or fewer times during the course of the nearly two-year custodial period to be more credible than Father's testimony that he visited nine times during that period. Nor did the trial court credit Father's testimony that Petitioners somehow prevented him from visiting with the children more. Thus, the trial court concluded that Petitioners had proven by clear and convincing evidence the grounds of abandonment by failure to support and abandonment by failure to visit.

As to the final ground, characterized by the trial court as "whether or not [Father is] in a position to take custody of the children at the present time," the trial court found that Father's intended living situation upon receiving custody of the children was "in no way acceptable[.]" The trial court credited the testimony of Petitioners, and especially

---

[7] In a separate case, the juvenile court granted Father the temporary care and custody of Mother's two children, Father's stepchildren, by order of October 14, 2021, over DCS's objection. The juvenile court ordered placement of DCS's Family Support Services in the home Father shared with his girlfriend.

Grandmother, that Father's anger issues had not been properly managed even after the completion of the online anger management course required by the juvenile court. The trial court also found that, given Father's remaining anger-related issues and the other instabilities in his life, it had "great concerns for the children's overall mental, emotional[,] and physical health." So the trial court concluded that Father was not in a position to take custody of the children.[8]

The trial court also concluded that the termination of Father's parental rights was in the children's best interests. Finally, the trial court concluded that adoption by Petitioners was in the best interests of the children. Petitioners filed a motion to approve their final adoption decree on November 17, 2022. Father also filed his notice of appeal on November 17, 2022.

## II. ISSUES PRESENTED

Father raises the following issues, which are taken from his brief:

1) Did the trial court err in finding by clear and convincing evidence [Father] abandoned the children by a) willfully failing to provide financial support for the children, and b) willfully failing to visit the children as defined in *Tenn. Code Ann. § 36-1-102(1)(A)(i)*?
2) Did the trial court err in ordering the termination of the parental rights of [Father] pursuant to *Tenn. Code Ann. § 36-1-113(g)(14)* by finding that [Father] was not in a position to take custody of the children at the time of the hearing?
3) Did the trial court err in finding that the termination of the parental rights of [Father] was in the best interests of the children?

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings

---

[8] No explanation exists in the record as to why the ground of persistence of conditions was not discussed in the trial court's order, as it was pleaded in the termination petition; however, Petitioners do not raise this decision as an issue on appeal. We therefore treat the ground of persistence of conditions as abandoned and will not discuss it further. *Cf. In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *5 (Tenn. Ct. App. Oct. 29, 2018) (holding that we do not review grounds not found by the trial court unless raised as an issue on appeal).

can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." ***In re Carrington H.***, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." ***Id.*** at 522 (citation omitted); *accord* ***In re Addalyne S.***, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." ***In re Carrington H.***, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." ***Id.*** (citing ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); ***In re M.A.R.***, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523–24. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." ***In re Carrington H.***, 483 S.W.3d at 524 (citation omitted).

## IV. ANALYSIS

### A. Grounds for Termination

The trial court found that three grounds existed for termination of Father's parental rights: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody of the children. We will discuss each in turn. *See* ***In re Carrington H.***, 483 S.W.3d at 525–26.

### 1. Abandonment

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment by a parent is a ground for the termination of parental rights and, in turn, Tennessee Code Annotated section 36-1-102 defines the term "abandonment." Under the version of that section that existed at the time the petition was filed, as relevant to this appeal, abandonment was defined as follows:

> For a period of four (4) consecutive months immediately preceding the filing
> of a . . . petition to terminate the parental rights of the parent . . . of the child
> who is the subject of the petition for termination of parental rights or
> adoption, that the parent . . . either [has] failed to visit or [has] failed to
> support or [has] failed to make reasonable payments toward the support of
> the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[9] The section further provides that a failure to visit consists of "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is defined as visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C). Similarly, a failure to support involves "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). When the provided support, "under the circumstances of the individual case, is insignificant given the parent's means[,]" it is considered token. Tenn. Code Ann. § 36-1-102(1)(C). The parent's abandonment within the relevant four-month period may not be rectified by resuming visitation or support subsequent to the filing of a termination petition. Tenn. Code Ann. § 36-1-102(1)(F). Here, the four-month period at issue spans from May 20, 2021 through September 19, 2021.[10]

A parent may raise as an affirmative defense that the failure to perform more than token visitation or provide more than token support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). In that case, the parent bears the burden of proving the absence of willfulness by a preponderance of the evidence. *Id.* Willfulness in terms of parental rights "does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will." *In re Audrey S.*, 182 S.W.3d at 863. (citations omitted). Instead, "a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863–64. Thus, a parent's failure to visit or support is willful when it is "the product of free will, rather than coercion"; accordingly, such failure "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.* at 864 (first citing *In re Adoption of Lybrand*, 329 Ark. 163, 946 S.W.2d 946, 950 (1997); and then citing *In re Serre*, 77 Ohio Misc. 2d 29, 665

---

[9] Throughout this Opinion, we cite to the statutes that were in place at the time the termination petition was filed in September 2021.

[10] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

N.E.2d 1185, 1189 (1996); **Panter v. Ash**, 177 Or. App. 589, 33 P.3d 1028, 1031 (2001)). We proceed to consider both types of abandonment alleged in this case: failure to visit and failure to support.

### a. Failure to Visit

The trial court found that Father had only minimal visits with the children during the relevant period, relying on Father's admission that he saw the children three times during all of 2021. The trial court also expressly credited the testimony of Petitioners, that Father saw the children a total of six or fewer times during the entire two-year custodial period. Although Father blamed his lack of seeing his children on Petitioners, the trial court credited Petitioners' testimony "that they never denied [Father] any requested visits with the children, only that the visits take place at appropriate times and under circumstances where they could be present to monitor [Father's] visits." The trial court agreed "that this was very appropriate, under the circumstances." The trial court also credited Petitioner's testimony that Father still suffers from "extreme anger issues" and specifically found that Petitioners "at all times have acted in the children's best interest[.]"

As an initial matter, it is clear that Father's visitation during the relevant four-month period was no more than "token" within the meaning of Tennessee Code Annotated section 36-1-102(1)(C). Relying on Father's own testimony, he visited with the children only three or four times in 2021, with only one or two visits occurring within the relevant period. The record also reflects that Father had only two phones calls with the children during the four-month period prior to the filing of the termination petition, for a total of just over seventy-four minutes. Thus, the record supports the trial court's conclusion that Father's contact with the children "constitute[d] nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C); s*ee, e.g.*, **In re Matthew T.**, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *12 (Tenn. Ct. App. Apr. 20, 2016) (four visits in a four-month period constituted token visitation); **In re E.L.R.**, No. E2014-00394-COA-R3-PT, 2014 WL 6735394, at *7 (Tenn. Ct. App. Dec. 1, 2014) (seeing the child five times in the four month period was token visitation); **In re Joseph G.**, No. E2012-02501-COA-R3-PT, 2013 WL 3964167, at *9 (Tenn. Ct. App. July 31, 2013) (weekly visits for only two of the four months constituted token visitation); **In re Hope A. A.**, No. E2012-01209-COA-R3-PT, 2013 WL 1933026, at *11 (Tenn. Ct. App. May 10, 2013) (five visits for a total of ten hours was insufficient); **In re Keri C.**, 384 S.W.3d 731, 750 (Tenn. Ct. App. 2010) (four or five visits was token visitation).

Father argues, however, that any failure to visit on his part was not willful. First, Father points to the fact that Petitioners admittedly made no effort to facilitate visits at a location where Father would not have to drive the six-hour round trip to Petitioners' home. We have previously held that when a parent lacked sufficient resources to travel the necessary distance, but maintained regular phone conduct with the children, the parent's

failure to visit was not willful. *See **In re Caira D.***, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, at *6–8 (Tenn. Ct. App. Nov. 25, 2014) (reversing finding that failure to visit was willful when father spoke to children every other week by telephone and lacked the financial resources or available alternatives to make the seven hour one-way trip); ***In re B.D.***, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8-10 (Tenn. Ct. App. Mar. 2, 2009) (concluding that mother's irregular visitation did not constitute willful failure to visit when the distance was prohibitive, DCS did not offer to help with transportation costs, and mother stayed in regular contact with her children by telephone). Here, however, Father did not demonstrate that, to the extent that he had transportation issues, those issues were outside of his control. Father was gainfully employed during the entirety of the custodial period and when he could not drive himself based on a suspended license, the record reflects that Father's girlfriend was willing to drive him to see the children. Moreover, Father did not maintain regular phone calls with the children in lieu of in-person visitation during the relevant period. Father has therefore not met his burden to show that his transportation issues prevent a finding of willfulness.

Next, Father asserts that "the acrimony between Father and [Petitioners] made Father's attempts at maintaining regular contact with the children more difficult." It is true that "when a parent attempts to visit his child but is 'thwarted by the acts of others,' the failure to visit is not willful." ***In re M.L.P.***, 281 S.W.3d 387, 392 (Tenn. 2009) (quoting ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007)). However, only "*significant* restraint or interference with the parent's attempt to visit the child" may excuse a parent's failure to visit. *Id.* at 393 (emphasis added) (citing ***In re Audrey S.***, 182 S.W.3d at 864). Examples of such conduct include: "(1) telling a man he is not the child's biological father; (2) blocking access to the child; (3) keeping the child's whereabouts unknown; (4) vigorously resisting a parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child." ***In re Audrey S.***, 182 S.W.3d at 864 n.34.

Father provides only a bare citation to ***In re Avagaline S.***, in support of his argument that his contentious relationship with Petitioners affected his ability to maintain regular contact with the children. In that case, the subject child was placed in the custody of her maternal grandparents, who suddenly and unilaterally decided to prohibit the father from visiting after allowing him visitation for the prior four years. No. E2020-00222-COA-R3-PT, 2020 WL 7310987, at *1 (Tenn. Ct. App. Dec. 11, 2020). When the father called to set up further visitation, he was told the grandparents would file harassment charges if he contacted them again. *Id.* at *5. Further, the grandparents strove to eliminate the father from the child's life: the father could not speak with the child by phone, mother's video call was ended when the father appeared on screen, and the mother was not allowed to speak to the child via speakerphone because the grandparents would not allow the father to even hear the child. *Id.* The child was also not allowed to know anything about the father, with the mother being prohibited from mentioning the father's name in the presence of the child or the grandparents, or referring to the father as the father of the child or her sibling. *Id.* Our high court found that the father had proven that it was "'more likely than not true'

-12-

that his failure to visit was not willful because [the grandparents] blocked his access to the [c]hild." *Id.* at *7 (quoting *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *8 (Tenn. Ct. App. July 22, 2020)). Because the grandparents' behavior "constituted a significant restraint or interference with his attempts to visit the [c]hild[,]" the father's failure to visit was excused. *Id.* (original brackets omitted) (quoting *In re M.L.P.*, 281 S.W.3d at 393).

That is simply not the situation before us here. Father has not established that there existed such antagonism between himself and Petitioners as to excuse his failure to conduct more than token visitation. Indeed, Petitioners testified that Father's requests for visitation were often made with little notice, but were still only denied if the visit would conflict with Petitioners' schedules; Father's phone calls with the children were cut short only when the conversation turned to the custody proceedings and the children became upset. The trial court expressly credited this testimony over that of Father. "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also In re Hope G.*, No. E2021-01521-COA-R3-PT, 2022 WL 4391897, *6 (Tenn. Ct. App. Sept. 23, 2022) (finding that the trial court is the "arbiter of witness credibility of those who testify live before it."); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) ("When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000))). Thus, as the trial court found, the relationship between Father and Petitioners created no significant interference with Father's ability to visit with the children, either in person or by phone.

Finally, Father relies on his efforts to comply with the juvenile court order and his subsequent filing of two petitions for return of custody as precluding a finding of willfulness. Father testified that he substantially complied with the juvenile court's requirements prior to filing these petitions, yet neither petition appears in the appellate record, preventing meaningful review of the arguments therein. *See Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) ("This Court's review is limited to the appellate record and it is incumbent upon the appellant to provide a record that is adequate." (citing *Jennings v. Sewell-Allen Piggly Wiggly*, 173 S.W.3d 710 (Tenn. 2005))). However, even in the parties' testimony regarding Father's petitions, there is no indication that Father was seeking the trial court's assistance in obtaining additional or unsupervised visitation due to any alleged interference by Petitioners. Instead, it appears that Father was operating under an "all or nothing" mentality where if Petitioners would not allow visitation exactly when and how Father wanted, he would only accept a full return of custody and was no longer willing to visit the children. Combined with the trial court's crediting of Petitioners' testimony that there was no interference with visitation, we cannot say that this argument establishes that Father's failure to visit was not willful. *See In re Hope G.*, 2022 WL

4391897, at *8 (father's failure to visit lacked willfulness where he filed a motion for contempt and petition for parenting plan after the mother restricted his visitation); *In re Adoption of A.M.H.*, 215 S.W.3d at 810 (failure to visit was not willful where parents were actively prevented from visiting before requesting return of custody). Accordingly, Father has not met his burden to prove a lack of willfulness by a preponderance of the evidence. The trial court's finding that Father's failure to conduct more than token visitation during the four-month period was willful is therefore affirmed.

### b. Failure to Support

As to abandonment by failure to support, there is no dispute that Father provided no financial support for the children at any point during the custodial period, despite being consistently employed and earning $20,000.00 to $30,000.00 per year. Although the parties disagree as to how many presents Father provided the children, the difference between one gift and three gifts, none within the relevant period, has little impact on our determination that his support in kind was no more than "token" under Tennessee Code Annotated section 36-1-102(1)(C). *See, e.g.*, *In re Kierani C.*, No. W2020-00850-COA-R3-PT, 2021 WL 4057222, at *15 (Tenn. Ct. App. Sept. 3, 2021) (finding father provided only token support after providing $27.00 in cash support and giving gifts consisting of clothing, toys, or food items on seven occasions); *In re Braxton M.*, 531 S.W.3d 708, 721 (Tenn. Ct. App. 2017) (finding token support where during the relevant period father only provided gifts at one Christmas and maybe some clothing); *In re Hailey S.*, No. M2015-00842-COA-R3-PT, 2016 WL 3209444, at *11 (Tenn. Ct. App. May 31, 2016) ("In this case, [f]ather never paid child support, other than token support or small gifts, throughout the entirety of the [c]hild's lifetime even when he was admittedly capable of working and actually employed at various times.").

Father again argues that his failure to support was not willful. He first points to his testimony that he made offers to pay child support to Grandfather, but the offers were refused. Grandfather disputed that Father had ever offered to bring support; Father himself admitted that his offers involved saying that he would bring money on his next visit, instead of simply presenting Petitioners with money. "A failure to pay child support is generally not considered willful if support has been offered and refused." *In re Adoption of Destiny R.D.*, No. M2011-01153-COA-R3-PT, 2012 WL 1066496, at *8 (Tenn. Ct. App. Mar. 27, 2012) (citations omitted). However, by statute, the burden falls on Father to prove a lack of willfulness. Tenn. Code Ann. § 36-1-102(1)(I). The only proof Father offered to indicate a lack of willfulness was his own testimony that he offered to provide support to Petitioners. But it does not appear that the trial court credited Father's testimony. Again, we find no basis to disregard that assessment. *See Wells*, 9 S.W.3d at 783. The record therefore contains nothing to support Father's contention that he made sincere offers of support that were rebuffed and thus, that his failure to support was not willful. *See In re Hope G.*, 2022 WL 4391897, at *8 (finding father did not meet burden to establish lack of willfulness where he failed to provide proof of efforts to put aside money for the child beyond his own

testimony); ***In re Avagaline S.***, 2020 WL 7310987, at *10 (failure to support was not willful where petitioners refused father's attempts to provide support).

Father also argues that he was trying to regain custody through the courts which should be inferred to mean he was willing to support the children, citing ***In re Chelbie F.***, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, *6 (Tenn. Ct. App. Apr. 27, 2007). The circumstances of our finding of a lack of willfulness in that case are distinguishable from those before us now. There, the mother conceded that she did not want to accept support from the father so the father filed a petition "seeking the court's assistance in establishing . . . his support obligation." ***Id.*** Again, we have no indication that Father's petitions resulted from animosity between the parties instead of Father's desire to have full custody of the children or nothing. And because we have no ability to review the petitions on appeal, we cannot say that they reflected any interest in providing financial support for the children on Father's part. *See **id.*** (finding that father "had filed and was pursuing a petition to establish his . . . support obligations before the petition to terminate his parental rights was filed."); ***Chiozza***, 315 S.W.3d at 489. Father has therefore not met his burden to prove a lack of willfulness by a preponderance of the evidence. The trial court's finding that Father's failure to provide more than token support during the four-month period was willful is therefore affirmed.

## 2. Willingness and Ability

As mentioned above, both the termination petition and the trial court framed the third ground for termination of Father's parental rights as whether Father is in a position to take custody of the children. However, in their petition for termination and on appeal, Petitioners cite to Tennessee Code Annotated section 36-1-113(g)(14). Under that section, parental rights may be terminated where:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that Father has failed to evince either his ability or his willingness to assume custody of the children. ***In re Brylan S.***, No. W2021-01446-COA-R3-PT, 2022 WL 16646596, at *8 (Tenn. Ct. App. Nov. 3, 2022) (citing ***In re Neveah M.***, 614 S.W.3d 659, 677 (Tenn. 2020)). The second requires proof that placing the children in Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

The entirety of the trial court's findings as to this ground, in relation to Father, is as follows:

> With regard to [Father], the court finds that [Father's] current living situation consists of living with a woman, not his wife, with her three children in an apartment that contains a bedroom where her three children stay, and another bedroom where he and his current significant other stay. [Father's] stated intent would be that he and his girlfriend would sleep on the couch while the two subject children of this case would sleep in their bedroom. The court finds that this is in no way acceptable, given the children's emotional and mental health. Furthermore, the court finds that [Father] is living with his girlfriend and her three children, while still remaining married and not having filed any action for divorce, does not lend itself to a stable home life that the court finds that the subject children desperately need. Furthermore, the court respectfully believes that [Father] is still suffering from anger related issues, and given the other instabilities in his life, the court has great concern for the children's overall mental, emotional and physical health. Therefore, the court finds that [Father] is not in a position at this point to take custody of the children.

As such, the trial court's order contains no findings as to how Father failed to demonstrate either a willingness or an ability to take physical custody of his children or provide them with financial support. Instead, the order focuses only on the effect of Father's current living arrangements on the children's "overall mental, emotional and physical health[,]" which we infer was intended to address the substantial harm prong of this ground.

The failure to make specific findings in support of each prong of this ground for termination prevents meaningful appellate review:

> With respect to termination cases, the trial court is specifically directed by the statute to "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). Furthermore, neither the trial court nor this Court may proceed to termination absent clear and convincing evidence of each necessary element of a ground for termination. *In re R.L.M.*, No. E2013-02723-COA-R3-PT, 2015 WL 389635, at *4 (Tenn. Ct. App. Jan. 29, 2015). Because the trial court did not make specific findings regarding each of the elements applicable to the failure to manifest ground, we are compelled to vacate the termination order with respect to this ground for termination as to the [parent] and remand for the preparation of appropriate findings of facts and conclusions of law as is required by the statute. *See In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *14 (Tenn. Ct. App. Jan. 25, 2019) (vacating termination order as to the [parent's] rights because of a failure to make proper findings to each

-16-

element as required under Tennessee Code Annotated section 36-1-113(g)(14)); *In re Brianna B.*, No. M2017-02436-COA-R3-PT, 2018 WL 6719851, at \*8 (Tenn. Ct. App. Dec. 19, 2018) (noting that the trial court failed to issue any specific findings of fact concerning the *substantial harm* element of the statute).

*In re Nevaeh B.*, No. E2020-00315-COA-R3-PT, 2020 WL 4920020, at \*3 (Tenn. Ct. App. Aug. 20, 2020); *see also In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at \*6 (Tenn. Ct. App. Apr. 9, 2020) (vacating where no findings regarding first prong); *In re Kamyiah H.*, No. M2021-00834-COA-R3-PT, 2022 WL 16634404, at \*7 (Tenn. Ct. App. Nov. 2, 2022) (vacating where no findings as to second prong).

Here, the trial court's order makes no findings that explicitly or implicitly address the first prong of this ground. And to the extent that the trial court's order can be read as ruling that the negative effect of Father's living arrangements on the children is sufficient to constitute substantial harm under the second prong of this ground, Father argues that this focus was error. Indeed, we have previously explained that "[f]inancial advantage and affluent surroundings simply may not be a consideration in determining a custody dispute between a parent and a non-parent." *In re Adoption of A.M.H.*, 215 S.W.3d at 813 (citing *Hawk v. Hawk*, 855 S.W.2d 573, 582 (Tenn. 1993) ("[M]ere improvement in quality of life is not a compelling state interest and is insufficient to justify invasion of Constitutional rights.")); *see also In re Braelyn S.*, 2020 WL 4200088, at \*13. Father also emphasizes that he completed many of the requirements the juvenile court set out as prerequisites for a petition for return of custody, and that, in a separate case, the juvenile court awarded him custody of the children's half siblings, arguing that both facts imply an ability and willingness to assume custody. The trial court's ruling that Petitioners established this ground for termination is vacated, and this cause is remanded for the entry of an order containing specific findings of fact and conclusions of law with regard to both prongs of this ground.

## B. Best Interest

Because we have determined that at least one statutory ground for terminating Father's parental rights has been proven, we must now decide if Petitioners have proven, by clear and convincing evidence, that termination of Father's rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When "the interests of the parent and the child[ren] conflict, courts are to resolve the conflict in favor of the rights and best interest of the child[ren]." *In re Navada N.*, 498 S.W.3d 579, 607 (Tenn. Ct. App. 2016).

As a preliminary matter, we address the version of the statutory best interest factors applicable to this action. Tennessee Code Annotated section 36-1-113(i) provides the factors for a trial court to consider when determining whether a child's best interest

supports termination of the parent's rights. Effective April 22, 2021, this subsection was amended by deleting the entirety of the list of nine best interest factors and substituting a new list of twenty factors. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). Thus, petitions for termination filed on or after April 22, 2021, require the use of the amended factors in considering the best interests of the subject children.[11] *See In re Jackson R.*, No. M2021-01545-COA-R3-PT, 2023 WL 353420, at *9 n.8 (Tenn. Ct. App. Jan. 23, 2023) (noting that "the amended statute applies only to petitions for termination filed on or after April 22, 2021").

In this case, the petition for termination and relative adoption was filed on September 20, 2021. Thus, the amended statutory best interest factors are applicable here. Indeed, when analyzing the children's best interests in their proposed findings of fact and conclusions of law, Petitioners considered the new factors. The trial court, however, applied the previous list of factors in its order finding the children's best interests to support terminating Father's parental rights. While we have held that it is harmless error for a trial court to use the updated factors when the old factors were applicable, *see In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022), *perm. app. denied* (Aug. 12, 2022), the inverse is not true. Although "the nine old factors 'are included in the new version of factors that went into effect in April 2021[,]' . . . the statute as amended adds a number of 'additional factors that should be considered, if relevant.'" *In re Alessa H.*, No. M2021-01403-COA-R3-PT, 2022 WL 3332653, at *14 (Tenn. Ct. App. Aug. 12, 2022) (first quoting *In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022), *perm. app. denied* (Tenn. Apr. 1, 2022); and then quoting *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022), *perm. app. denied* (Tenn. Mar. 17, 2022)). Accordingly, when a trial court utilizes the old factors despite the timing of the termination petition requiring the use of the new factors, we have consistently reversed the findings related to best interest and remanded to allow for review of the updated statutory factors. *See id.*; *In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *13–14 (Tenn. Ct. App. June 22, 2023); *In re Liberty T.*, No. E2022-00307-COA-R3-PT, 2023 WL 2681897, at *10 (Tenn. Ct. App. Mar. 29, 2023); *In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *14 (Tenn. Ct. App. Mar. 8, 2023). We therefore reverse the trial court's use of the old best interest factors, vacate its findings as to the children's best interests and remand for reconsideration under the statutory factors in effect at the time the termination petition was filed. We also acknowledge that "time has marched on during this litigation." *In re Disnie P.*, 2023 WL 2396557, at *14 (quoting *In re Alessa H.*, 2022 WL 3332653, at *14). Thus, the trial court may consider additional evidence on remand in its discretion. *Id.*

## V. CONCLUSION

---

[11] Multiple edits have since been made to section 36-1-113, without affecting subsection (i) and the best interest factors.

The judgment of the Polk County Circuit Court terminating Appellant Damien N.'s parental rights to Justin N. and Darrien N. is affirmed in part and vacated in part, and this cause is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant Damien N. and one-half to Appellees David N. and Lisa N., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE